## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**COLONEL SCOTT C. NAUMAN,**

                        **Plaintiff**,

v.

**CHRISTINE WORMUTH, et al.**,

                        **Defendants**.

**Case No. 23-2102-DDC-TJJ**

---

## <u>MEMORANDUM AND ORDER</u>

Plaintiff Scott C. Nauman's four daughters allege that he sexually abused them. Plaintiff serves as a Colonel in the United States Army. Plaintiff's commanding officer has entered a Military Protective Order (MPO) that prevents plaintiff from contacting his daughters. Plaintiff then filed this suit seeking declaratory and injunctive relief. He argues that the Army's issuance of an indefinite MPO without notice or a hearing violates his procedural and substantive due process rights.

Defendants Christine Wormuth, Lieutenant General Milford H. Beagle Jr., and Lieutenant Colonel Benjamin Gong[1] have filed a Motion to Dismiss (Doc. 10). They assert that the court should dismiss this action as nonjusticiable. The court, for reasons explained below, denies defendants' motion.

---

[1] Plaintiff sues the three defendants in their official capacities for declaratory and injunctive relief under 5 U.S.C. § 702. Doc. 1 at 2–3 (Compl. ¶¶ 7–9).

The court begins its analysis with a short primer on two pieces of military law:  MPOs and Article 138 complaints.  This primer starts with a glossary of the jargon used throughout the parties' briefs and, derivatively, this Order.

**I.        Glossary**

To no one's surprise, a case about our military systems brings a fair dose of jargon with it.  To simplify things, the court provides this glossary of abbreviations and acronyms:

CPO:  Civilian Protective Order

DCF:  Kansas Department for Children and Families

DoD:  Department of Defense

GCMCA:  General Court Martial Convening Authority

MPO:  Military Protective Order

OTJAG-AL:  Office of the Judge Advocate General's Administrative Law Division

TJAF:  The Judge Advocate General

**II.       Military Protective Orders**

The Army's law enforcement regulations define an MPO as a "written lawful order issued by a commander that orders a Solider to avoid contact with those persons identified in the order."  32 C.F.R. § 635.19(a).  And the statutes governing the armed forces provide that an MPO "issued by a military commander shall remain in effect until such time as the military commander terminates the order or issues a replacement order."  10 U.S.C. § 1567.

In 2021, Department of Defense Instruction No. 6400.06 took effect.  Dep't of Def., DoD Instruction 6400.06, at 1 (May 16, 2023) ("Instruction 6400.06"). [2]  Instruction 6400.06 governs the DoD's response to domestic abuse involving military and certain affiliated personnel.  *Id.*  It

---

[2]        Instruction 6400.06 is available at
https://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodi/640006p.pdf.

gives commanders "overriding responsibility for the response to domestic abuse." *Id.* at § 3.5.  If the service member is the alleged abuser, then the service "member's commander has responsibility for victim safety and for appropriate abuser accountability[.]" *Id.*  Instruction 6400.06 directs commanders to ensure "protection of all persons alleged or known to be at risk from domestic abuse by issuing and enforcing an appropriate MPO." *Id.* at § 3.5(c)(5).

The military also utilizes a Family Advocacy Program to address domestic abuse. Instruction 6400.06 incorporates the Family Advocacy Program into the MPO process. *Id.* at § 3.1.  It provides that commanders may keep an "MPO in place if [the Family Advocacy Program] advises risk to the victim's safety remains, even if a [civilian protective order] is rescinded." *Id.* at § 3.5.d.(5)(c).

## III.        Article 138 Complaints

If soldiers believe their commanding officer has committed a wrong against them—for example, issuing an improper MPO against them—Article 138 of the Uniform Code of Military Justice provides soldiers with a process to request review.  Article 138 provides

> Any member of the armed forces who believes himself wronged by his commanding officer, and who, upon due application to that commanding officer, is refused redress, may complain to any superior commissioned officer, who shall forward the complaint to the officer exercising general court-martial jurisdiction over the officer against whom it is made.  The officer exercising general court-martial jurisdiction shall examine into the complaint and take proper measures for redressing the wrong complained of; and he shall, as soon as possible, send to the Secretary concerned a true statement of that complaint, with the proceedings had thereon.

10 U.S.C. § 938.

The Army's military justice regulations provide additional guidance and procedure for Article 138 complaints.[3]  *See* Dep't of Army, AR 27-10, *Military Justice*, (Nov. 20, 2020).

---

[3]        Army Regulation 27-10 is available at
https://armypubs.army.mil/epubs/DR_pubs/DR_a/ARN31271-AR_27-10-001-WEB-2.pdf.

Before filing an Article 138 complaint, Army Regulation 27-10 requires complainants to "first seek relief from the respondent commanding officer." *Id.* at § 19-6. The commander has 15 days to respond to the soldier's initial request. *Id.* at § 19-7.f. If this prerequisite, initial request doesn't resolve the alleged wrong, then the solider may submit an Article 138 complaint to the General Court Martial Convening Authority (GCMCA) with jurisdiction over the respondent commanding officer. *Id.* at § 19-8.a.

Before the GCMCA reaches the merits of the complaint, it must make two threshold inquiries. The GCMCA first must determine whether the Article 138 complaint is sufficient—*i.e.*, the complainant submitted the initial request, and the complaint complies with certain substantive requirements. *Id.* at § 19.10.a. If the GCMCA finds the complaint sufficient, GCMCA "must next determine if each of the alleged wrongs made in the complaint is or is not an appropriate matter for further examination and action pursuant to Article 138[.]" *Id.* at § 19-11.a. For example, Army Regulation 27-10 defines "[m]atters relating to courts-martial" as inappropriate for Article 138 review. *Id.* at § 19-11.c.(1). If the "GCMCA determines a complaint is both sufficient and contains one or more alleged wrongs appropriate for potential redress pursuant to this chapter, the GCMCA will examine into the complaint." *Id.* at § 19-12.a.

Army Regulation 27-10 grants the GCMCA discretion to decide the "nature and method of the examination" of the Article 138 complaint. *Id.* at § 19-12.b. But the GCMCA's findings must meet specific requirements. The GCMCA must issue a final report that "include[s] specific findings regarding each alleged wrong . . . and . . . describe the factual basis and reasoning for each finding." *Id.* at § 19-12.e. These "specific findings must address whether the action or omission complained of was—

(1) In violation of law or regulation.

4

(2) Beyond the legitimate authority of the respondent.

(3) Arbitration, capricious, or an abuse of discretion.

(4) Materially unfair."

*Id.*

After examining an Article 138 complaint, the GCMCA must act. *Id.* at § 19.13.a. Army Regulation 27-10 requires the GCMCA to "act personally" and explicitly provides that this "authority may not be delegated." *Id.* at § 19-13.a. The GCMCA can (1) deny the redress, if no redress is appropriate, (2) "grant whatever redress is appropriate and within such officer's authority to provide[,]" or (3) if the appropriate redress is beyond the GCMCA's authority, forward the complaint (along with other things) "to the commander or agency with the necessary authority[.]" *Id.* at § 19-13.c.

Once the GCMCA has acted on the Article 138 complaint, it must forward the complaint packet to the Judge Advocate General (TJAG). *Id.* at § 19-14.a. TJAG reviews the GCMCA's action on behalf of the Secretary of the Army. *Id.* at § 19-14.b. TJAG has discretion to "return the file for additional information or investigation or other action." *Id.* TJAG then forwards the file to the Office of the Judge Advocate General's Administrative Law Division (OTJAG-AL), who reviews the file. *Id.* This is the final step. "Unless the GCMCA is otherwise notified by OTJAG-AL within 90 days of forwarding the file to OTJAG-AL, the GCMCA's action on the Article 138 complaint is considered final." *Id.* at § 19-14.c.

With these two processes explained, the court next recites the factual background of plaintiff's lawsuit.

IV.        **Factual Background**[4]

Plaintiff Scott Nauman serves as a Colonel in the United States Army.  Doc. 1 at 2

(Compl. ¶ 6).  He and his ex-wife, Sara Mader-Nauman, divorced in June 2018.  *Id.* at 3 (Compl.

¶ 10).  Plaintiff and Ms. Mader-Nauman have four daughters:  K.N. (14 years old), A.N. (17

years old), J.N. (19 years old), and M.N. (23 years old).  *Id.* at 1 (Compl. ¶ 1).

Plaintiff initially secured residential custody of the minor children under a stipulated

agreement.  *Id.* at 3 (Compl. ¶ 10).  In July 2019, Ms. Mader-Nauman moved to modify custody

and child support, seeking residential custody of the minor children.  *Id.* (Compl. ¶ 12).

Throughout the custody dispute, Ms. Mader-Nauman has alleged abuse.  *Id.* (Compl. ¶ 13).

When court officers investigated earlier allegations, they found no evidence of abuse.  *Id.*  The

Child Custody Investigator recommended that all children reside with plaintiff.  *Id.*

Under the current parenting plan, the two minor children—K.N. and A.N.—reside with

Ms. Mader-Nauman.  *Id.* (Compl. ¶ 14).  The current parenting plan provides that each parent

will allow the other parent frequent, meaningful, and pleasant communication with the children.

*Id.*  And the current parenting plan grants plaintiff parenting time every other weekend and one

night during the week.  *Id.*  The plan divides holiday parenting time evenly.  *Id.*

In 2022, plaintiff's four daughters accused him of sexually abusing them.  On November

2, 2022, plaintiff's commanding officer, Lieutenant Colonel Benjamin Gong issued an MPO

ordering plaintiff to have no contact with Ms. Mader-Nauman or their four daughters.  Doc. 10-3

at 2–4 (Gong Decl. Ex. 1).  The MPO listed the following protected persons:  Ms. Mader-

Nauman, K.N., A.N., J.N., and M.N.  *Id.*

---

[4]        The court gathers these facts from the Complaint and, as explained below, some of the exhibits
defendants submitted with their motion.  *See below* § V.A.

Meanwhile, the civilian investigation continued.  On November 18, 2022, a state court issued a temporary order of protection from abuse, which this Order refers to as the civilian protective order (CPO).  Doc. 10-4 (Gong Decl. Ex. 2).  The CPO lists Ms. Mader-Nauman and K.N. and A.N.—plaintiff's two daughters who still are minors—as protected persons.  *Id.*  On December 13, 2022, plaintiff and Ms. Mader-Nauman agreed to dismiss the CPO.  Doc. 10-5 (Gong Decl. Ex. 3).

On January 25, 2023, plaintiff submitted an Article 138 complaint to Lieutenant Colonel Gong.  Doc. 1 at 4 (Compl. ¶ 18); Doc. 10-7 (Gong Decl. Ex. 5).  Plaintiff's Article 138 complaint asked Lieutenant Colonel Gong to lift or modify the MPO.  Doc. 10-7 at 6 (Gong Decl. Ex. 5).  Lieutenant Colonel Gong denied this request.  Doc. 10-8 (Gong Decl. Ex. 6).  Lieutenant Colonel Gong explained,

> Considering the serious nature of the sexual assault allegations made against you by your daughters, and in consultation with law enforcement, the family advocacy program, the protected parties' Special Victims' Counsels, the Special Victims Prosecutor, and the Office of the Staff Judge Advocate, I have decided to keep the MPO in place.

*Id.*

Plaintiff submitted a second Article 138 complaint to the GCMCA with jurisdiction: Lieutenant General Milford Beagle.  Doc. 1 at 4 (Compl. ¶ 19); Doc. 10-10 (Gong Decl. Ex. 8).  He denied the second complaint by verbal order on March 2, 2023.  Doc. 1 at 4 (Compl. ¶ 19).

In March 2023, plaintiff was arrested and charged in Kansas state court with aggravated indecent liberties with a child.  Doc. 10-9 at 2 (Gong Decl. Ex. 7).  The state court released plaintiff on bond and one of his bond conditions requires that plaintiff "will not commit, cause to be committed or knowingly permit to be committed on the [his] behalf, the intimidation of a witness or victim[.]"  *Id.*

7

With this factual background in mind, the court next recites the legal standard governing defendants' motion.

## V.       Legal Standard

### A.       Motion to Dismiss Legal Standard

Defendants move under Fed. R. Civ. P. 12(b)(1).  Doc. 10 at 1.  This part of Rule 12 allows a defendant to move to dismiss for lack of subject matter jurisdiction.  But defendants base their motion on justiciability.  And the "justiciability of a claim is not a question of subject matter jurisdiction, but rather of the court's competence to address a particular claim." *Reilly v. Sec'y of Navy*, 12 F. Supp. 3d 125, 139 (D.D.C. 2014) (citing *Oryszak v. Sullivan*, 576 F.3d 522, 526 (D.C. Cir. 2009) (Ginsburg, J., concurring) ("That a plaintiff makes a claim that is not justiciable because [it is] committed to executive discretion does not mean the court lacks subject matter jurisdiction over his case[.]")).

Instead, the authorities suggest that the court should evaluate a justiciability challenge under Fed. R. Civ. P. 12(b)(6).  *Oryszak*, 576 F.3d at 526 (Ginsburg, J., concurring) ("Upon a proper motion, a court should dismiss the [nonjusticiable] case for failure to state a claim."); *Mindes v. Seaman*, 453 F.2d 197, 198 (5th Cir. 1971) ("Since we find that [military service member's] federal claims are not frivolous, it follows that the court erred in basing its dismissal on lack of jurisdiction.  The proper test was to determine if this cause fails to state a claim on which relief may be granted.").  Defendants' failure to utilize the proper procedural mechanism isn't fatal to their motion.  A "court must decline to adjudicate a nonjusticiable claim even if the defendant does not move to dismiss it under Fed. R. Civ. P. 12(b)(6)." *Oryszak*, 576 F.3d at 526–27 (Ginsburg, J., concurring).  The court thus treats defendants' motion as a motion to dismiss for failure to state a claim under Rule 12(b)(6).  This decision has consequences for the materials the court can consider.

When considering a motion to dismiss under Rule 12(b)(6), the court generally "may not look beyond the four corners of the complaint." *Am. Power Chassis, Inc. v. Jones*, No. 13-4134-KHV, 2017 WL 3149291, at *3 (D. Kan. July 25, 2017) (citing *Rubio ex rel. Z.R. v. Turner Unified Sch. Dist. No. 202*, 475 F. Supp. 2d 1092, 1097 n.3 (D. Kan. 2007)).  The Circuit has recognized the following three exceptions to the four corners of the complaint rule:  (1) "documents that the complaint incorporates by reference"; (2) "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity"; and (3) matters of "which a court may take judicial notice."  *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010) (internal quotation marks and citations omitted).  Plaintiff didn't attach any documents to his complaint.  So, the court starts with the second exception.

If "a plaintiff does not incorporate by reference or attach a document to [his] complaint, but the document is referred to in the complaint and is central to plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss." *Geer v. Cox*, 242 F. Supp. 2d 1009, 1016 (D. Kan. 2003) (internal quotation marks and citation omitted).  Otherwise, to consider a matter outside the pleadings, the court must convert the motion to dismiss into one for summary judgment under Federal Rule of Civil Procedure 56.  *Id.* at 1015–16 ("Reversible error may occur ... if the district court considers matters outside the pleadings but fails to convert the motion to dismiss into a motion for summary judgment.").

Here, defendants attached ten exhibits to their Motion to Dismiss:[5]

---

[5]    Defendants understandably submitted these additional materials because they brought their motion under Rule 12(b)(1).  Under certain types of Rule 12(b)(1) motions, the court may "reference . . . evidence outside the pleadings" including "affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts."  *Stuart v. Colo. Interstate Gas Co.*, 271 F.3d 1221, 1225 (10th Cir. 2001) (citation and internal quotation marks omitted).  Unfortunately, the current motion isn't that kind of motion.

- Declaration of Lieutenant Colonel Gong

- MPO

- CPO

- CPO Dismissal

- DCF Safety Plan

- January 25, 2023, Article 138 Request

- February 8, 2023, Article 138 Denial

- Leavenworth County Bond

- February 9, 2023, Article 138 Request

- March 23, 2023, Article 138 Denial

Of these ten exhibits, plaintiff's Complaint refers to six: (1) MPO, (2) CPO, (3) CPO dismissal, (4) January 25, 2023, Article 138 Request, (5) February 8, 2023, Article 138 Denial, and (6) February 9, 2023, Article 138 Request. Doc. 1 at 1, 4 (Compl. ¶¶ 1, 15 (mentioning MPO), ¶ 16 (mentioning CPO and CPO dismissal), ¶ 18 (mentioning January 25, 2023, Article 138 request and February 8, 2023, Article 138 Denial), ¶ 19 (mentioning February 9, 2023, Article 138 request)). And plaintiff doesn't contest the authenticity of defendants' versions of these exhibits. So, the court properly can consider these six exhibits.

This leaves the other four exhibits, and the court thus must decide whether it properly can consider those four exhibits when deciding this Rule 12(b)(6) motion. And there's just one exception to the four corners rule left: judicial notice.

*First*, the Gong Declaration. The court may not consider this declaration without converting the motion into a summary judgment motion. The court can't take judicial notice of it. And plaintiff's Complaint doesn't reference this document. So, the declaration doesn't fall

within any of the three exceptions recognized by the Tenth Circuit that permit a district court to consider a matter outside the pleadings without converting the motion into one seeking summary judgment.[6]

*Second*, the DCF Safety Plan. The court resolves this motion without reference to this exhibit, so the court needn't decide whether it properly could consider it.

*Third*, the Leavenworth County Bond. "On a motion to dismiss, the court may take judicial notice of public records from other proceedings without converting the motion into one seeking summary judgment." *Ellis v. Chase Bank USA, NA*, No. 17-02290-DDC, 2017 WL 5158311, at *2 (D. Kan. Nov. 7, 2017); *see also Tal v. Hogan*, 453 F. 3d 1244, 1264 n.24 (10th Cir. 2006). The court thus takes judicial notice of this bond document.

*Last*, the March 23, 2023, Article 138 Denial. Plaintiff's Complaint mentions a verbal denial from March 2, 2023. Doc. 1 at 4 (Compl. ¶ 19). The court, adopting the date from plaintiff's Complaint, concludes that the Complaint doesn't refer to this exhibit.[7] And, because the court uses the verbal denial date from plaintiff's Complaint, it needn't decide whether it properly can consider the formal March 23 denial.

With these threshold procedural questions resolved, the court turns to the legal standard governing defendants' justiciability argument.

### B.    Justiciability Legal Standard

---

[6]    The court declines to convert defendants' Motion to Dismiss into a summary judgment motion for several reasons. For one thing, neither side has asked the court to convert the motion. And defendants filed their motion at an early stage in the case. *See Ledbetter v. Bd. of Cnty. Comm'rs*, No. 00-2180-KHV, 2001 WL 705806, at *2 (D. Kan. May 31, 2001) ("Because defendants filed their motion at an early stage of the proceedings and discovery is not scheduled to close [for more than one month], the Court decline[d] to consider evidence outside the pleadings."). Indeed, justiciability is a threshold inquiry and the court declines to reach the summary judgment stage so quickly. The court also hasn't notified the parties that it will apply a summary judgment standard. The court thus declines to convert the motion.

[7]    Defendants' exhibit—the March 23, 2023, Article 138 denial—lies well beyond the four corners of the Complaint because plaintiff filed his Complaint on March 6, 2023. *See generally* Doc. 1.

"Justiciability is a particularly apt inquiry when one seeks review of military activities, and the court may not address a claim that presents a nonjusticiable issue." *Volk v. United States*, 111 Fed. Cl. 313, 324 (2013) (quotation cleaned up). Justiciability depends on "whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded." *Baker v. Carr*, 369 U.S. 186, 198 (1962).

"Traditionally the courts have been reluctant to intervene in or review military affairs, particularly those dealing with military discretion." *Lindenau v. Alexander*, 663 F.2d 68, 70 (10th Cir. 1981). The Supreme Court has explained the roots of this reluctance this way: the "complex subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject always to civil control of the Legislative and Executive Branches." *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973) (emphasis omitted). There "'are thousands of routine personnel decisions regularly made by the services which are variously held nonjusticiable or beyond the competence or jurisdiction of courts to wrestle with.'" *DeRito v. United States*, 851 F. App'x 860, 861 (10th Cir. 2021) (quoting *Murphy v. United States*, 993 F.2d 871, 873 (Fed. Cir. 1993)). So, while "actions against military officials for violating their own regulations are reviewable or justiciable," *Lindenau*, 663 F.2d at 71, personnel matters and other "[d]iscretionary decisions of the military are not subject to review by civilian courts," *Schulke v. United States*, 544 F.2d 453, 455 (10th Cir. 1976) (per curiam).

Our Circuit prescribes a two-part test to determine whether a military plaintiff's claim is justiciable. *DeRito*, 851 F. App'x at 861–62. *First*, the court asks "whether the case involves an alleged violation of a constitutional right, applicable statute, or regulation, and whether intra-

service remedies have been exhausted." *Lindenau*, 663 F.2d at 71 (quotation cleaned up).
*Second*, the court "evaluat[es] the scope and nature of the intervention into otherwise military
affairs necessary to vindicate the alleged violation[.]" *DeRito*, 851 F. App'x at 861–62. This
second step requires the court "to weigh the nature and strength of the challenges to the military
determination, the potential injury to the plaintiff if review is refused, the type and degree of
anticipated interference with the military function, and the extent to which military discretion or
expertise is involved in the challenged decision." *Lindenau*, 663 F.2d at 71 (quotation cleaned
up). This second part of the test "essentially balances the interest of the parties, with a
preference against interference in the military." *Costner v. Okla. Army Nat'l Guard*, 833 F.2d
905, 907 (10th Cir. 1987).

## VI.        Analysis

The parties agree that plaintiff has met step one of the *Lindenau* test by alleging a
constitutional violation and exhausting his intra-service remedies. *See Lindenau*, 663 F.2d at 71.
And so the court need only consider step two, the "scope and nature of the intervention into
otherwise military affairs necessary to vindicate the alleged violation." *DeRito*, 851 F. App'x at
861–62. The court undertakes this inquiry below, dividing it into three parts. The court begins
with the nature and strength of plaintiff's challenge. Next, the court assesses the potential injury
to plaintiff if the court denies review. And, last, the court addresses the extent of anticipated
interference with the military function and the extent of the military's discretion and expertise.

### C.        Nature and Strength of the Challenges to the Military Determination

The court's first consideration "weigh[s] the nature and strength of the challenges to the
military determination[.]" *Lindenau*, 663 F.2d at 71 (quotation cleaned up). Here, plaintiff
brings two § 1983 claims: (1) procedural due process and (2) substantive due process. Doc. 1 at
5 (Compl. ¶¶ 21–24). The court evaluates the nature and strength of each claim, in turn, below.

### 1.      Procedural Due Process

Plaintiff's procedural due process claim asserts that defendants' "imposition of an indefinite restraining order upon all contact between Nauman and his daughters with no procedural safeguards violates due process of law under the Fifth Amendment[.]" *Id.* (Compl. ¶ 22).

Because this is a *procedural* due process claim the court notes that "a challenge to the particular procedure followed in rendering a military decision may present a justiciable controversy[.]" *Barnes v. United States*, 473 F.3d 1356, 1361 (Fed. Cir. 2007) (quotation cleaned up).  For example, in *Reilly v. Secretary of Navy*, plaintiff brought an improper discharge claim stemming from the Navy's decision denying plaintiff two promotions.  12 F. Supp. 3d at 126–27.  The *Reilly* court noted that "while courts do sometimes review the actions of military agencies, the Court's jurisdiction in this area is typically limited to challenges to *procedures*—it does not extend to the *merits* of a promotion decision." *Id.* at 140.

A procedural due process claim requires a two-step inquiry:  (1) "whether the plaintiff had a constitutionally protected interest[,]" and (2) "whether the process afforded was adequate to protect that interest." *Koessel v. Sublette Cnty. Sheriff's Dep't*, 717 F.3d 736, 748 (10th Cir. 2013) (citation omitted).  It's undisputed that plaintiff has a constitutionally protected interest:  a liberty interest in the care, custody, and control of his children. *See J.B. v. Washington Cnty.*, 127 F.3d 919, 925 (10th Cir. 1997) ("It is undisputed that J.B.'s liberty interest in the custody, care, and management of her children are of paramount importance.").  Plaintiff's procedural due process claim thus turns on the process defendants afforded him.

To determine what process the Constitution requires, the Supreme Court prescribes three factors for courts to consider:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).  Our Circuit has called these three factors "somewhat flexible."  *J.B.*, 127 F.3d at 924; *see also Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) ("[D]ue process is flexible and calls for such procedural protections as the particular situation demands.").

Here, each side emphasizes its own interest.  Plaintiff emphasizes his interest in the care, custody, and control of his children.  Defendants argue "the Army's interest in protecting the victims in an ongoing investigation and prosecution is so great that it outweighs the Plaintiff's right to familial association."  Doc. 10 at 10.  Assuming without deciding that each side identifies strong interests,[8] plaintiff's procedural process claim boils down to the procedures used and the potential value of additional safeguards.

Plaintiff argues that the MPO process lacked a finding of imminent danger and a hearing.  Plaintiff also points out that the MPO doesn't have an expiration date; under 10 U.S.C. § 1567, the MPO can "remain in effect until such time as the military commander terminates the order or issues a replacement order."  Defendants respond, arguing that their process included plenty of procedural safeguards.  Defendants show that they followed the Article 138 process—with three separate officers reviewing plaintiff's Complaint three times—and followed Instruction 6400.06.  And, defendants assert, plaintiff availed himself of multiple stages of review.

---

[8]      Indeed, the court agrees that defendants have a strong interest in protecting potential survivors from domestic and sexual abuse.  Yet, as explained below, the court questions whether defendants have identical interests to *state* governments and whether defendants can rely on caselaw weighing a parent's interest against the interests of the *state*.  *See below* § V.A.2.

The court need not decide the merits of the case now.  Instead, the court need only decide whether plaintiff brings a strong claim.  He does.  The court is troubled by the indefinite nature of the MPO.[9]  To be sure, Congress granted the military broad discretion to determine the appropriate length of an MPO when it enacted 10 U.S.C. § 1567.  But such broad discretion doesn't resolve the question in this case:  whether defendants, when applying that discretion, violated plaintiff's procedural due process rights by imposing an indefinite MPO without a hearing.

Plaintiff also argues that defendants never made a finding of imminent danger, as required to justify depriving plaintiff of his children.  Defendants don't direct the court to any part of the Army's policies that require an imminent danger or good cause finding before issuing an MPO like the one issued here.  Defendants cite Instruction 6400.06, which gives plaintiff's commander the "responsibility for victim safety and for appropriate abuser accountability[.]" Instruction 6400.06 at § 3.5.  But Instruction 6400.06 doesn't seem to provide any substantive or evidentiary standard to commanders issuing an MPO.  At best, Instruction 6400.06 requires commanders to "[i]ssue and check compliance with an MPO, when necessary, to safeguard a victim, quell a disturbance, and maintain good order and discipline."[10]  *Id.* at § 3.5.d.(2).

---

[9]    Neither party cited the Kansas law dictating how protective order procedures usually function in state court, but the court finds the comparison helpful.  Kansas law allows one type of protective order—a final protective order—to "remain in effect until modified or dismissed by the court and . . . for a fixed period of time not less than one year and not more than two years[.]"  Kan. Stat. Ann. § 60-3107(e). Kansas law also allows plaintiffs to extend final protective orders "for an additional period of not less than one year and not more than three years."  Kan. Stat. Ann. § 60-3107(e)(1).  That protective order can become permanent if, after notice and a hearing, "the court determines by a preponderance of the evidence that the defendant has:  (A) Violated a valid protection order; (B) previously violated a valid protection order; or (C) been convicted of a person felony or any conspiracy, criminal solicitation or attempt thereof, under the laws of Kansas or the laws of any other jurisdiction which are substantially similar to such person felony, committed against the plaintiff or any member of the plaintiff's household." Kan. Stat. Ann. § 60-3107(e)(2).

[10]    Kansas law again provides a useful comparison.  For example, a court can grant a plaintiff an ex parte, emergency protection from abuse order "if the judge deems it necessary to protect the plaintiff or

The court thus concludes that the nature and strength of plaintiff's procedural due process claim favor justiciability.

## 2.      Substantive Due Process

Next, the court evaluates the substance and nature of plaintiff's substantive due process claim to determine whether it's a justiciable claim.  Plaintiff's substantive due process claim asserts that the MPO "violates Nauman's substantive due process right in the integrity of his family, specifically the care, custody, and control of his children."  Doc. 1 at 5 (Compl. ¶ 24).

Substantive due process "forbids the government to infringe certain 'fundamental' liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest."  *Reno v. Flores*, 507 U.S. 292, 301–02 (1993) (emphasis in original).  A substantive due process analysis thus requires the court to "begin with a careful description of the asserted right[.]"  *Id.* at 302.

That's a problem because plaintiff here doesn't carefully describe the right he's asserting. Plaintiff asserts that he "has a fundamental right and liberty interest in the care, custody, and control of his children, whether they be considered minors or adults."  Doc. 14 at 3. Unfortunately, plaintiff doesn't cite any legal authority for this statement.  In contrast, defendants frame plaintiff's right differently.  Defendants characterize plaintiff's right as the one to familial association.  Doc. 10 at 10.  This is an important distinction.

If plaintiff's substantive due process claim implicates his right to familial association, then the court would apply undue burden balancing.  *See, e.g.*, *PJ ex rel. Jensen v. Wagner*, 603

---

minor child or children from abuse."  Kan. Stat. Ann. § 60-3105(a).  Kansas law provides that "[i]mmediate and present danger of abuse to the plaintiff or minor child or children shall constitute good cause for the entry of the emergency order."  *Id.*  This emergency order "expire[s] on 5:00 p.m. on the first day when the court resumes court business.  At that time, the plaintiff may seek a temporary order from the court."  Kan. Stat. Ann. § 60-3105(b).

F.3d 1182, 1199 (applying undue burden balancing test to plaintiffs' substantive due process claim "to determine whether the plaintiff's right to familial association ha[d] been infringed."). The undue burden test balances "the individual's interest in liberty against the State's asserted reasons for restraining individual liberty." *Id.* (quotation cleaned up). "The purpose of the balancing test is to ascertain whether a defendant's conduct constitutes an undue burden on the plaintiff's associational rights." *Id.* (citation omitted).

On the other hand, government actions that infringe on plaintiff's fundamental rights are subject to strict scrutiny, *Petrella v. Brownback*, 787 F.3d 1242, 1261 (10th Cir. 2015), and the court will uphold the government action only if it's narrowly tailored to serve a compelling government interest, *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997). And deciding whether plaintiff has a fundamental right is a loaded question. The Supreme Court has delineated many fundamental rights over the years, including the right "to direct the education and upbringing of one's children[.]" *Id.* at 720. But it's not clear whether that fundamental right extends to plaintiff's adult children. And the Supreme Court has "always been reluctant to expand the concept of substantive due process[.]" *Id.* (quotation cleaned up). So, without plaintiff precisely articulating the fundamental substantive due process right he means to invoke here—backed by legal authority—the court can't obey the Supreme Court's directive to "exercise the utmost care" around substantive due process. *Id.*

This distinction—right to association versus fundamental right—matters because undue burden balancing and strict scrutiny are fundamentally different tests. Luckily for the court, it need not decide which test to apply to determine the issue presented by defendants' justiciability argument: whether plaintiff presents a strong substantive due process claim. That's so because the court concludes he does.

Indeed, our Circuit has recognized that there "is perhaps no more delicate constitutional barrier protecting individual freedom from governmental interference than that which protects against state interference with parental autonomy." *Jensen*, 603 F.3d at 1187.  Because this inquiry is so delicate, plaintiff's claim qualifies as a strong claim.  And this case presents a governmental interest twist that strengthens plaintiff's claim even more.  Whether the court applies the undue burden test or strict scrutiny, the court must weigh the military's interest in issuing the MPO.  The military's interest in the case presents a tricky issue for defendants. Defendants argue that they have the same interests in protecting plaintiff's children that a state government has in the health and safety of minor children.  Doc. 10 at 10–11.  But defendants cite no authority for that proposition.  *Ipse dixit* conclusions rarely carry the day.  No matter which test the court applies, plaintiff presents a strong challenge.

In sum, the nature and strength of plaintiff's substantive due process claim favors justiciability.

### D.    Potential Injury to Plaintiff if Review is Refused

Next, the court considers "the potential injury to the plaintiff if review is refused[.]" *Lindenau*, 663 F.2d at 71 (quotation cleaned up).  Defendants assert that plaintiff's "potential injury is low to nonexistent" because, no matter what the court does with the MPO, plaintiff won't achieve his ultimate goal of talking to his children.  Doc. 10 at 12.  Defendants reason that plaintiff's bond order, stemming from a state court criminal prosecution, mandates that plaintiff not intimidate witnesses or victims.  *Id.*  And, given that—for purposes of this motion— plaintiff's daughters are witnesses or victims, plaintiff's ability to contact his daughters "will remain inhibited" even if the MPO goes away.  *Id.*  Defendants also argue that "each of his daughters, through their special victim's counsel, have expressed their desires for the MPO to remain in place—a strong indication of their desire not to communicate with Plaintiff."  *Id.* at

13.[11]  Plaintiff responds that the lack of contact with his children has cost him valuable time with

them.  Doc. 14 at 5.  And he argues that the evidence that plaintiff's children don't want to be

around him "is hearsay and irrelevant[.]"  *Id.*

The court agrees with plaintiff that this factor favors justiciability.  The court disagrees

with the way defendants have framed plaintiff's injury.  Plaintiff's "injury has to be fairly

traceable to the challenged action of the defendant, and not the result of the independent action

of some third party not before the court."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61

(1992) (quotation cleaned up).  Without the MPO, whether plaintiff can contact his daughters

relies on their "independent actions."  *Id.*  The court can't—and shouldn't—order plaintiff to talk

to his children or order his children to talk to him, their alleged abuser.  Instead, the court only

can address the challenged actions of defendants.  That's the MPO and the procedures

defendants used to put it in place.  And the MPO allegedly deprives plaintiff of his procedural

and substantive due process rights, including his parental rights.  If the court finds the MPO

unconstitutional and enjoins its use, plaintiff may (or may not) choose to exercise those rights.

How plaintiff's children respond to plaintiff's choice is beyond the province of this court.

The court also rejects defendants' argument that plaintiff's bond conditions somehow

reduce plaintiff's injury.  Plaintiff's bond conditions prevent him from intimidating witnesses or

victims.  At this juncture, the court can't say with certainty that plaintiff contacting his daughters

would amount to intimidation in every instance.

---

[11]      Defendants cite Lieutenant Colonel Gong's Declaration to support this statement.  *See* Doc. 10 at
13.  The court, as explained above, declines to consider this declaration because it's beyond the four
corners of the Complaint, the Complaint doesn't refer to it, and the court can't take judicial notice of it.
*See above* § V.A.  Nonetheless, when Lieutenant Colonel Gong denied plaintiff's Article 138 request, he
explicitly mentioned that he'd consulted with the special victims' counsel and decided to keep the MPO
in place.  Doc. 10-8 (Gong Decl. Ex. 6).  And the court properly can consider Lieutenant Colonel Gong's
February 8, 2023, denial of plaintiff's Article 138 request because plaintiff mentioned this document in
his Complaint.  *See above* § V.A.  So, the court can consider defendants' argument.

If the court declines to review this case, then the MPO will remain in place indefinitely, so the injury to plaintiff's due process rights will continue indefinitely.  The court thus concludes that this factor favors review.

### E.     Extent of Interference with the Military Function and Extent of Military Discretion or Expertise

Last, *Lindenau* directs the court to consider "the type and degree of interference with the military function, and the extent to which military discretion or expertise is involved in the challenged decision."  663 F.2d at 71 (quotation cleaned up).  The court addresses these two questions together.  "The type of interference and the military experience and discretion involved[] present a single inquiry, focusing on disruption of military functions and distortion of factors such as troop morale which are important to the operation of the military."  *Id.* at 74 (quotation cleaned up).

Here, defendants argue that the court shouldn't interfere in the decisions of plaintiff's commanders.  The Army's regulations provide that the "commander is responsible for all aspects of unit readiness."  Army Regulation 600-20, *Army Command Policy* (July 24, 2020), § 1-6.c. And commanders must "be vigilant in inspecting the conduct of all persons who are placed under their command" and "guard against and suppress all dissolute and immoral practices[.]"  *Id.* at § 1.6.c.(4)(d)(2).  The concept of unit readiness extends beyond the individual soldier. "Commanders have an obligation to maintain Army Family readiness."  *Id.* at § 5-2.  The Army's regulations define Family readiness this way:

> Family readiness is the state of being prepared to effectively navigate the challenges of daily living experienced in the unique context of the Army.  A prepared Army Family understands the challenges they may face, is aware of supportive resources available to them, has the skills to function in the face of challenges, and uses those skills and resources to manage challenges.

21

*Id.* at § 5-2.a.(1).  So, defendants emphasize that plaintiff's commanders, Lieutenant Colonel Gong and Lieutenant General Beagle, have acted to:  (i) protect plaintiff's daughters to ensure their safety, (ii) protect the morale, discipline, and welfare of their soldiers, and (iii) maintain Army family readiness.  Defendants assert that if the court intrudes into this case, the court "could significantly hinder a commander's ability to lead their formation in the future."  Doc. 10 at 14.

Defendants also emphasize that the statute governing MPOs gives commanders full discretion to decide the duration of MPOs.  Indeed, 10 U.S.C. § 1567 provides, "A military protective order issued by a military commander shall remain in effect until such time as the military commander terminates the order or issues a replacement order."  Defendants assert that the Army issued Instruction 6400.06 "to provide guidelines and guardrails to assist commanders in their issuing of MPOs."  *Id.* at 15.  Defendants thus argue that the court should defer to the military's expertise because both the legislative and executive branches have expressly approved "the latitude a commander has in issuing an MPO[.]"  *Id.*

The court isn't persuaded.  The matters at issue here—sexual abuse, parental rights, due process—lie beyond the military's areas of expertise.  *See Mindes*, 453 F.2d at 201–02 ("Courts should defer to the superior knowledge and experience of professionals in matters such as promotions or orders directly related to specific military functions.").  Here, the military effectively is functioning as something of a family law court.  That's not a specific military function.  The court doesn't doubt that domestic abuse affects combat readiness.  But the court remains concerned that defendants may have failed to strike the proper balance between plaintiff's due process rights and the military's interests.  The court can decide these issues without major interference with the military.  "Because there will always be some interference

when review is granted, courts ought to abstain only where the interference would be such as to seriously impede the military in the performance of vital duties." *U.S. Navy Seals 1–26 v. Biden*, 27 F.4th 336, 348 (5th Cir. 2022) (quotation cleaned up).  The court doesn't view family law matters as the military's "vital duties."

The court also isn't persuaded by defendants' argument about discretion.  "Courts should defer to the superior knowledge and experience of professionals in matters such as promotions or orders directly related to specific military functions." *Id.* at 349 (quotation cleaned up).  For example, "complex, subtle, and professional decisions" that go "to the composition, training, equipping, and control of a military force are essential professional military judgments." *Id.* (quotation cleaned up).  To be sure, Congress delegated significant discretion to commanders to decide how long MPOs should last.  But that discretion doesn't readily lend itself to the area of family law, nor does it divest this court of power to hear this case. *See* Edward H. Cooper et al., *Federal Practice & Procedure* § 3534.1 (3d ed. 2023) ("There is nothing in the power of Congress to make rules for the government and regulation of the land and naval forces . . . that ousts the power of courts to protect the constitutional rights of individuals against improper military actions.").  And the constitutional concerns in this case go far beyond the issue governed by statute—the MPO's duration.  Due process also requires the court to consider notice, hearing, interest, and so on.  These "particular issues and constitutional questions presented here are not so foreign to those outside the military [so] as to give the Court serious concern about its ability to decide the case." *Poffenbarger v. Kendall*, 588 F. Supp. 3d 770, 786 (S.D. Ohio 2022).

The court thus concludes that this factor favors review.

**VII.      Conclusion**

In sum, all parts of the *Lindenau* inquiry favor justiciability.  The court acknowledges its duty to balance the *Lindenau* factors with "a preference against interference in the military."

*DeRito*, 851 F. App'x at 862 (quotation cleaned up).  Here, however, all factors favor review. The court thus denies defendants' Motion to Dismiss (Doc. 10).

        **IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' Motion to Dismiss (Doc. 10) is denied.

        **IT IS SO ORDERED.**

        **Dated this 26th day of February, 2024, at Kansas City, Kansas.**

                                      **s/ Daniel D. Crabtree**
                                      **Daniel D. Crabtree**
                                      **United States District Judge**