IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

SCOTT C. NAUMAN,

                Plaintiff,

v.

CHRISTINE WORMUTH, Secretary of
the United States Army, et al.,

                Defendants.

Case No. 23-2102-DDC-TJJ

## MEMORANDUM AND ORDER

This dispute arises between plaintiff Scott C. Nauman—a Colonel in the United States Army—and a host of Army defendants.[1]  The Army issued a military protective order (MPO) restricting plaintiff's contact with his four daughters, who allege he sexually abused them. Plaintiff argues the indefinite MPO—issued without notice—violated his procedural and substantive due process rights.  Failing on their first attempt to dismiss this case, defendants now have filed a Second Motion to Dismiss (Doc. 23).  This time, defendants have invoked Fed. R. Civ. P. 12(b)(1), asserting that the court lacks subject matter jurisdiction to decide the case's claims.  In a nutshell, they argue that their own actions—rescinding the allegedly unconstitutional MPO—has mooted this case.  And they also argue plaintiff lacks standing. Plaintiff cries foul.  He asserts that defendants' voluntary cessation of the allegedly wrongful conduct doesn't moot his claims.  And he asserts he still has standing.

---

[1]      Plaintiff sues defendants in their official capacities, and only for declaratory and injunctive relief. Doc. 1 at 2–3 (Compl. ¶¶ 7–9).

This Order takes up three issues: (1) which of the Article III case-or-controversy requirements must the court address; (2) whether the voluntary cessation exception to mootness keeps this case alive; and (3) even if an Article III case or controversy still exists, whether the court must dismiss under the doctrine of prudential mootness. But first, the court summarizes the facts that govern the current motion.

## I.    Background

The following facts come from the administrative record (Doc. 22), exhibits the parties filed with their briefs, and facts appearing in the Complaint (Doc. 1). *See below* § II (explaining what materials the court evaluates on a Rule 12(b)(1) motion to dismiss).

Colonel (COL) Scott C. Nauman has four daughters he shares with his ex-wife, Sara Mader-Nauman: K.N., now 15 years old; A.N., now 19 years old; J.N., now 20 years old; and M.N., now 24 years old. Doc. 1 at 1 (Compl. ¶ 1); Doc. 24 at 2. In 2022, plaintiff's daughters accused him of sexual abuse. *See* Doc. 22 at 26–27 (First Gong Decl. ¶ 3). On November 2, 2022, Lieutenant Colonel (LTC) Benjamin Gong, issued an MPO ordering plaintiff not to contact Ms. Mader-Nauman or their four daughters. Doc. 22 at 43–45 (November 2, 2022, MPO).

Separately, a state court issued a temporary order of protection from abuse on November 18, 2022. Doc. 22 at 103. For clarity, this Order refers to this type of protection order as a civilian protective order (CPO). The November 18, 2022, CPO listed Ms. Mader-Nauman as a protected person. *Id.* In late 2022, plaintiff and Ms. Mader-Nauman agreed to dismiss the CPO. Doc. 22 at 27–28 (First Gong Decl. ¶ 6). The parties disagree about this agreement's effect. LTC Gong apparently understood "that this mutual dismissal was predicated on the understanding that the MPO would remain in place, but that the parties agreed to a modification[.]" *Id.* And plaintiff would "not go[] near his girls until this is resolved[,]" "MPO

2

or no MPO[.]" *Id.* at 96 (email from plaintiff's counsel). Plaintiff conversely asserts that the "dismissal was predicated on the fact that [p]laintiff would voluntarily refrain from direct contact with his children (or comply with an order of the same), if the military lifted all other restraints that limited his ability to be involved in the parenting of his children[.]" Doc. 24 at 2–3 (citing Doc. 22 at 96). In any event, LTC Gong modified the MPO on January 24, 2023. Doc. 22 at 47 (January 24, 2023, MPO); *id.* at 28 (First Gong Decl. ¶ 6).[2]

On March 6, 2023, plaintiff filed this suit against defendants, alleging that the MPO violated plaintiff's procedural and substantive due process rights. *See generally* Doc. 1.[3] Defendants then filed their first Motion to Dismiss, arguing this controversy is non-justiciable because courts are generally reluctant to intervene in military affairs. Doc. 10 at 8. The court denied the motion on February 26, 2024, concluding the required inquiry favored justiciability in this case. Doc. 17 at 23–24. After that, things began to shift immediately. The following timeline is helpful:

- **March 4, 2024** – Ms. Sara Mader-Nauman texted Angela McClure in the Leavenworth County Attorney's Office. Doc. 27 at 2; Doc. 27-3. Ms. Mader-Nauman wrote: "The Army is dropping the MPO. I think they've talked to you

---

[2]    The modified MPO is referred to as "the MPO" throughout this Order. LTC Gong modified the MPO by issuing a "limited contact order" permitting plaintiff to communicate with Ms. Mader-Nauman about "medical, school, and financial requirements in support of their children." Doc. 22 at 94.

[3]    Plaintiff was arrested on March 14, 2023, and charged with aggravated indecent liberties with a child. Doc. 23 at 3; Doc. 22 at 29 (First Gong Decl. ¶ 10). He was released on bond the next day. Doc. 22 at 30. One of his surety-recognizance bond conditions required plaintiff not to "commit, cause to be committed or knowingly permit to be committed on [his] behalf, the intimidation of a witness or victim[.]" *Id.* Plaintiff points out that there has never been a no-contact order as part of these criminal charges. Doc. 24 at 3.

about this.  Can you guys apply for an order of protection for [one of the

daughters]?"  Doc. 27-3 at 2.  And later, she wrote, "I'll have to do it."  *Id.* at 3.

- **Also March 4, 2024** – Defense counsel emailed plaintiff's counsel seeking to

  "discuss this litigation following the [c]ourt's order on justiciability[.]"  Doc. 24-9

  at 3.  While defense counsel couldn't "affirm the Commanding Officers' orders

  until [he had] them," he understood "that there is a likely possibility that this case

  will be mooted."  *Id.*

- **March 5, 2024** – Ms. Mader-Nauman applied for a new CPO, listing K.N. as a

  protected person.  Doc. 22 at 12.  She requested the CPO because "[u]ntil this

  week, there was a military protective order in place to protect [K.N.], but that is

  being downgraded to [a] no contact order."  *Id.* at 15.

- **March 6, 2024** – The District Court for Leavenworth County, Kansas issued the

  new CPO.  *Id.* at 20.

- **March 8, 2024** – LTC Gong contacted plaintiff, seeking to schedule a meeting

  based on "some new information."  Doc. 24-2 at 4.  The new information was

  "related to a CPO that [LTC Gong] received."  *Id.* at 3.

- **March 12, 2024** – LTC Gong canceled the MPO.  Doc. 22 at 8–9.  His stated

  reason for doing so was the "Civilian Protection Order issued."  *Id.* at 9.  He also

  implemented a no-contact order.  *See* Doc. 24-3 at 2.  Plaintiff asked LTC Gong

  "if he could still be prosecuted for [alleged violations of the MPO.]"  Doc. 24 at 6;

  Doc. 24-4 at 4 (Nauman Decl. ¶ 10).  LTC Gong "confirmed that lifting the MPO

  did nothing to affect the legality or legitimacy of the previously issued order, nor

the possibility of prosecution in the future."  Doc. 24 at 6; Doc. 24-4 at 3–4 (Nauman Decl. ¶ 7).

- **March 22, 2024** – LTC Gong rescinded the no-contact order.  Doc. 22 at 6 ("On 22 March 2024, counseling with COL Nauman was conducted to inform him the No Contact order issued on 12 March 2024 was rescinded.").

After the parties filed their briefs, the state court entered a Final Order of Protection from Abuse against plaintiff.  Doc. 26 at 1; Doc. 26-1 at 1 (listing K.N. as a protected person).  The court found plaintiff had presented a "credible threat" to K.N.'s safety and that the abuse allegations were proven by a preponderance of the evidence.  Doc. 26-1 at 2.  The final order is effective until March 6, 2025.  *Id.* at 1.

With this background, the court now addresses the relevant legal standard.

## II.    Legal Standard for Rule 12(b)(1) Dismissal

Under Rule 12(b)(1), a defendant may move the court to dismiss for lack of subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  There are two types of Rule 12(b)(1) challenges: (1) facial attacks on allegations in the complaint to challenge their sufficiency, and (2) factual attacks on the facts on which subject matter jurisdiction depends.  *Holt v. United States*, 46 F.3d 1000, 1002–03 (10th Cir. 1995), *abrogated on other grounds by Cent. Green Co. v. United States*, 531 U.S. 425, 437 (2001); *Blood v. Labette Cnty. Med. Ctr.*, No. 22-cv-04036-HLT-KGG, 2022 WL 11745549, at *2 (D. Kan. Oct. 20, 2022) (explaining the two forms for a motion to dismiss for lack of jurisdiction under Rule 12(b)(1)).  Facial attacks are resolved based solely on the complaint, accepting all of plaintiff's allegations as true.  *Holt*, 46 F.3d at 1002.  In

5

contrast, on factual attacks, the court consider matters outside the complaint, and the allegations in the complaint aren't presumptively true.[4] *Id.* at 1003.

Here, defendants present factual attacks to support their Rule 12(b)(1) motion. Defendants argue that LTC Gong's dismissal of the MPO nullified the case or controversy requirement.  Doc. 23 at 6.  The parties filed the administrative record, which includes documents reflecting the dismissal of the MPO.  *See* Doc. 22 at 8–9.  So, defendants attack the facts on which subject matter jurisdiction depends.  *See Cheever v. Zmuda*, No. 20-2555-JAR-KGG, 2021 WL 1854198, at *2 (D. Kan. May 10, 2021) (concluding defendants made a factual attack on a mootness challenge by attaching documents reflecting the changed circumstances after filing of the complaint).  The allegations in this case's Complaint thus don't bind the court. Nor need the court presume those allegations are true.

The court's analysis begins with the Article III case-or-controversy doctrines and decides which of them the court must address here.

## III.    The Standing and Mootness Morass

Article III "limits the jurisdiction of the federal courts to the adjudication of 'Cases' or 'Controversies.'"  *Jordan v. Sosa*, 654 F.3d 1012, 1019 (10th Cir. 2011) (citing U.S. Const. art. III, § 2, cl. 1).  "Without a live, concrete controversy, [the court] lacks jurisdiction to consider claims no matter how meritorious."  *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1109 (10th Cir. 2010) (quotation cleaned up).  The case-or-controversy requirement

---

[4]       When resolving the jurisdictional question is "intertwined with the merits of the case[,]" the court must convert a Rule 12(b)(1) motion to dismiss into a 12(b)(6) motion to dismiss or a Rule 56 motion for summary judgment.  *Holt*, 46 F.3d at 1003.  A jurisdictional question is intertwined with the merits when "resolution of the jurisdictional question requires resolution of an aspect of the substantive claim." *Paper, Allied-Indus., Chem. & Energy Workers Intern. Union v. Cont'l Carbon Co.*, 428 F.3d 1285, 1292 (10th Cir. 2005) (internal quotation and citation omitted).  Here, the standing and mootness questions aren't intertwined with the merits—the court needn't resolve now whether defendants violated plaintiff's due process rights.  So, the court needn't convert the motion.

encompases four primary doctrines:  standing, ripeness, mootness, and political question.  *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).

Here, the court must disentangle two of these "notoriously murky" case-or-controversy doctrines:  standing and mootness.  *Lucero v. Bureau of Collection Recovery, Inc.*, 639 F.3d 1239, 1242 (10th Cir. 2011).  Defendants appear to argue that plaintiff lacks standing to seek prospective relief because LTC Gong canceled the MPO, meaning his claims are moot.  *See* Doc. 23 at 6–7 (explaining Article III standing and arguing that no "allegation of injury . . . continues after the cancellation of the military orders" and concluding that there is no "concrete interest that would survive the mootness of the cancellation of the military orders").  Plaintiff responded by alleging that he still had standing and that the case isn't moot because the voluntary cessation exception applies.  Doc. 24 at 7–13 (arguing an injury in fact remains because plaintiff faces threats of criminal prosecution for past violations of the now rescinded MPO).  Defendants return serve, asserting that plaintiff's brief improperly adds new allegations to keep the controversy alive.  Doc. 25 at 1–2.

The parties' briefs assume that both doctrines are implicated by the same post-complaint intervening event:  LTC Gong's dismissal of the MPO.  And the parties assume that plaintiff must prove standing under the circumstances as they exist today, not as they existed when plaintiff filed the Complaint.[5]  But the parties' logic would render the voluntary cessation exception useless and put the onus on plaintiff to prove that there's still a case or controversy.  This outcome is at odds with the law.  Here's why.

---

[5]    Defendants don't dispute that plaintiff had standing when plaintiff filed the Complaint.  *See* Doc. 23 at 7 ("To be sure, when [p]laintiff filed suit, he had standing for the alleged deprivation of his constitutional rights.").

"'Article III demands that an actual controversy persist throughout all stages of litigation.'" *West Virginia v. EPA*, 597 U.S. 697, 718 (2022) (quoting *Hollingsworth v. Perry*, 570 U.S. 693, 705 (2013)).  But the Supreme Court has explained that it "is the doctrine of mootness, not standing, that addresses whether an *intervening circumstance* has deprived the plaintiff of a personal stake in the outcome of the lawsuit." *Id.* at 719 (quotation cleaned up) (emphasis added).  And standing "is determined as of the time the action is brought." *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1154, 1155 n.5 (10th Cir. 2005) (explaining a Tenth Circuit holding that a plaintiff had "lost standing" during a lawsuit should have been framed instead as "a mootness question").

This distinction tracks.  And it matters.  Standing and mootness aren't interchangeable. The Supreme Court clarified as much in one of its key case-or-controversy opinions: *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167 (2000).  In this case, the Court criticized the Fourth Circuit for "conflat[ing] . . . initial standing to bring suit with . . . postcommencement mootness[.]" *Id.* at 174 (internal citations omitted).  The Court explained, though, that the Circuit's confusion was "understandable[.]" *Id.* at 189.  After all, the Court repeatedly had described mootness as "standing set in a time frame." *Id.* (quotation cleaned up).  Nonetheless, the mootness-not-standing distinction matters for two reasons.[6]

For one, the burden rests on different parties.  "[A] defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* at 190.  But "it is the plaintiff's burden to establish standing[.]" *Id.*  If a plaintiff had to prove standing anew after

---

[6]      For another description of why these two distinctions matter, see *WildEarth Guardians v. Pub. Serv. Co. of Colo.*, 690 F.3d 1174, 1182–83 (10th Cir. 2012).

every post-complaint intervening event, a defendant might not ever have to prove mootness.  The law doesn't support this "always-plaintiff's-burden" framework.

For another, mootness has two exceptions that standing doesn't.  *Lucero*, 639 F.3d at 1242–43 ("These exceptions [capable of repetition yet evading review and voluntary cessation] do not extend to the standing inquiry, demonstrating the contours of Article III as it distinctly pertains to mootness.").  "The plain lesson . . . is that there are circumstances in which the prospect that a defendant will engage in (or resume) harmful conduct may be too speculative to support standing, but not too speculative to overcome mootness."  *Laidlaw*, 528 U.S. at 190.  And this seemingly inconsistent result is noticeable where the plaintiff lacked standing "at the outset of the litigation[,]" but not after the action that arguably mooted an already-filed case.  *Id.* at 180.

Here, defendants argue that rescinding the MPO—a post-complaint intervening event— eliminated the case or controversy.  So, at bottom, standing isn't the question here, mootness is.  And defendants bear the "heavy" burden to prove it.  *See West Virginia*, 597 U.S. at 719 ("That burden is heavy where, as here, the only conceivable basis for a finding of mootness in the case is the [defendant's] voluntary conduct." (quotation cleaned up)).  The parties rely in large part on the confusing doctrine of standing.  But because plaintiff had standing when he filed the Complaint,[7] the court merely addresses the merits of mootness and its voluntary cessation exception, below.

---

[7]    Defendants never argue that plaintiff lacked standing at the case's outset.  And, they admit, in fact, that plaintiff had standing when he filed the case.  Doc. 23 at 7.  The allegedly injurious MPO was in effect on that date.  *See* Doc. 1 at 6 (Complaint filed March 6, 2023); Doc. 22 at 8–9 (noting the MPO was amended on January 24, 2023 and canceled on March 12, 2024).

IV.    **Article III Mootness**

Defendants argue that plaintiff's request for a declaratory judgment is moot under Article III because a court order won't affect defendants' treatment of plaintiff.  Doc. 23 at 7–8.  And they argue plaintiff's request for injunctive relief is moot because there isn't any remaining conduct to enjoin.  *Id.* at 9.  Plaintiff responds that the voluntary cessation exception exists for a situation like this when it applies.  Doc. 24 at 10.  The court's analysis begins with the doctrinal landscape.

A.    **Legal Standard**

The mootness doctrine "is grounded in the requirement that any case or dispute that is presented to a federal court be definite, concrete, and amenable to specific relief."  *Jordan*, 654 F.3d at 1024 (quotation cleaned up).  Ordinarily, "a claim for [a] prospective injunction becomes moot once the event to be enjoined has come and gone."  *Prison Legal News v. Fed. Bureau of Prisons*, 944 F.3d 868, 880 (10th Cir. 2019) (quoting *Citizen Ctr. v. Gessler*, 770 F.3d 900, 907 (10th Cir. 2014)).  And claims for declaratory relief are moot when they don't "settle some dispute which affects the behavior of the defendant toward the plaintiff."  *Id.* (quotation cleaned up).

But a defendant can't moot a case simply by voluntarily ceasing the allegedly wrongful conduct.  *Laidlaw*, 528 U.S. at 189.  If it could, nothing would stop the defendant from engaging in the conduct again after dismissal.  *Prison Legal News*, 944 F.3d at 880–81.  And plaintiffs would have no pragmatic recourse, other than filing a new suit.  This exception applies to requests for both declaratory and injunctive relief.  *See Brown v. Buhman*, 822 F.3d 1151, 1169 (10th Cir. 2016) (recognizing that voluntary cessation exception could apply in that case because plaintiffs sought a declaratory judgment and injunction, not damages).

To avoid this exception, defendants must satisfy "the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Prison Legal News*, 944 F.3d at 881 (quotation cleaned up).[8]  But our Circuit doesn't require the absence of any possibility that the behavior could recur. *Id.*  Instead, "[v]oluntary cessation of offensive conduct will only moot litigation if it is *clear* that the defendant has not changed course simply to deprive the court of jurisdiction." *Jordan*, 654 F.3d at 1037 (emphasis in original) (internal quotation marks and citation omitted).

Defendants must offer more than an "informal promise or assurance" that they will cease the challenged practice or that they intend to change it.  *Rio Grande Silvery Minnow*, 601 F.3d at 1118.  And "corrective actions that do not fully comport with the relief sought are also insufficient." *Prison Legal News*, 944 F.3d at 881 (quotation cleaned up).  Corrective action that is permanent or forecloses the reasonable possibility of recurrence will suffice. *Id.*  This kind of corrective action includes rescinding or changing policies. *Id.*

But, as defendants address, this exception's burden is "not insurmountable, especially in the context of government enforcement." *See Brown*, 822 F.3d at 1167; Doc. 23 at 12 (citing *Brown*).  To be sure, courts properly "may accord more solicitude to government officials' claims that their voluntary conduct moots a case." *Prison Legal News*, 944 F.3d at 881 (quotation cleaned up).  But courts don't apply such solicitude reflexively. *Id.*  Instead, "government self-correction provides a secure foundation for mootness so long as it seems genuine." *Id.* (internal quotation marks and citation omitted).  "[A]bsent evidence the voluntary cessation is a sham, the mere possibility a successor official may shift course does not

_____

[8]    Our Circuit recognized that "[t]he Supreme Court's voluntary cessation cases suggest the word 'absolutely' adds little to this formulation.  After reciting this standard, the Court sometimes omits 'absolutely' from its subsequent analysis, instead using the 'reasonably be expected' language as shorthand." *Prison Legal News*, 944 F.3d at 881 n.20 (internal quotation marks and citation omitted).

necessarily keep a case live." *Id.*  At bottom, "to show that a case is truly moot, a defendant must prove no reasonable expectation remains that it will return to its own ways." *Fed. Bureau of Investigation v. Fikre*, 601 U.S. 234, 241 (2024) (quotation cleaned up).  And "[t]hat much holds for governmental defendants no less than for private ones." *Id.*  So, how does this doctrine apply here?

### B.    Analysis

Despite defendants' efforts to show their conduct was above board, plaintiff argues it was a "coordinated effort" undertaken "with the specific expectation and objective of making this case moot[.]"  Doc. 24 at 10.  While the timeline provokes some skepticism, the court is unwilling to go as far as plaintiff does.  Still, the court concludes that defendants have failed to establish that their conduct can't "reasonably be expected to recur." *See Prison Legal News*, 944 F.3d at 881.  The court pulls both of these threads together, in turn, below.

### 1.    Defendants' Reasons for Rescinding the MPO

*First*, plaintiff argues defendants changed course solely because they intended to moot this case.  To support this argument, plaintiff provides the following timeline of events. *See* Doc. 24 at 10; Doc. 27 at 2.

- One week after the court issued its Memorandum and Order denying defendants' first Motion to Dismiss, defense counsel emailed plaintiff's counsel asking to schedule a conversation in view of that Order. *See* Doc. 17 (Order denying Motion to Dismiss issued February 26, 2024); Doc. 24-9 at 3 (email sent on March 4, 2024).  Specifically, defense counsel explained that though he couldn't "affirm the Commanding Officers'

orders until [he had] them, [it was his] understanding that there is a likely possibility that this case will be mooted." Doc. 24-9 at 3.[9]

- That same day, Ms. Mader-Nauman sent a text message asserting that the "[A]rmy is dropping the MPO[,]" so she would need to file a CPO. Doc. 27-3 at 2–3.

- The next day, Ms. Mader-Nauman filed her petition for the CPO. Doc. 22 at 12 (showing protection from abuse petition filed March 5, 2024). And in her petition, Ms. Mader-Nauman asserted, "[u]ntil this week, there was a military protective order in place . . . but that [order] is being downgraded to [a] no contact order." *Id.* at 15.

- The state court issued the new CPO on March 6, 2024. Doc. 22 at 20.

- But the Army didn't officially rescind the MPO until March 12. Doc. 22 at 8–9. And the stated reason for rescinding the MPO then was that a "Civilian Protection Order [had] issued." *Id.* at 9; Doc. 23 at 13 ("LTC Gong considered the Kansas state court's March 6, 2024, issuance of a Temporary Order of Protection from Abuse and Ms. Mader-Nauman's Petition for Protection from Abuse Order.").

Plaintiff urges the court to draw a key inference from the timeline: namely, defendants resolved to moot this case after the court denied their first Motion to Dismiss. More simply put, plaintiff's view of pertinent events goes like this: First, defendants intended to rescind the MPO. Then, defendants communicated to plaintiff's counsel the possibility that this recission would moot the case. Next, Ms. Mader-Nauman applied for a new CPO because the Army planned to rescind the MPO. Then, the state court issued the new CPO. Finally, defendants rescinded the

---

[9]    Defense counsel then wrote: "I am hopeful that this path is something that the Parties will all be in agreement towards and that Col Nauman might be willing to voluntarily dismiss." Doc. 24-9 at 3. Neither party identifies whether this conversation between counsel actually occurred or, if it did, the result of the conversation. And neither party identifies what plaintiff thought about voluntarily dismissing his case because the Army was planning to rescind the MPO. But, given defendants' current Motion to Dismiss, it isn't difficult to guess.

MPO.  This order of events suggests that defendants had mootness in mind days before the CPO issued and over a week before they rescinded the MPO.  This sequence supports plaintiff's theory that defendants ceased their conduct to "deprive the court of jurisdiction."  Doc. 24 at 12.  But, while that's so, the sequence isn't entirely damning, or dispositive.  That's so because defendants refute some of plaintiff's story.

Defendants argue that the "alleged coordinative conduct" between counsel, the Army, and Ms. Mader-Nauman actually supports their position.  Doc. 25 at 4 n.6.  It demonstrates, defendants assert, their "efforts to satisfy some lingering concerns for the protection of the daughter and prepare for a new normal of non-MPO coverage."  *Id.*[10]  Defendants then refer to LTC Gong's reasons for rescinding the MPO.  *See id.* at 4.  They're four-fold:

- "I considered the fact that COL Nauman had generally complied with the MPO since January 2023[.]"

- "I consulted with my legal advisors[.]"

- "I followed my obligation to ensure the protection of COL Nauman's daughters, as outlined in DoD Instruction 6400.06, ¶ 3.5(c)(5)[.]"

- "I also knew that COL Nauman remained subject to a surety bond limiting certain communications with his daughters[.]"

Doc. 25-1 at 2 (Second Gong Decl. ¶ 5).

Defendants argue that these reasons—and not an attempt to moot this case—influenced LTC Gong's decision to rescind the MPO.  And defendants assert that because plaintiff must

---

[10]    Defendants also argue that their communications suggesting "that the MPO cancellation would moot this case," are unsurprising.  Doc. 25 at 4 n.7.  That's so, they assert, because "the newly alleged continuing injury is outside of the Complaint."  *Id.*  Maybe it's unsurprising that defendants thought their conduct would eliminate the case or controversy.  But the court doesn't see how this argument rebuts plaintiff's argument that the MPO was canceled for that purpose.  In fact, it suggests the opposite.

comply with the CPO—which would protect the victims—defendants' "allegedly wrongful behavior could not reasonably be expected to recur."  Doc. 23 at 13 (explaining that though LTC Gong issued a no-contact order for 10 days after rescinding the MPO, he canceled both, which reflects that he considered plaintiff's compliance with the CPO).

Defendants' argument continues, asserting that the "history of the case"—namely four additional things that LTC Gong understood (as of May 2023) about the state court proceedings—clarify that defendants' allegedly wrongful behavior reasonably couldn't recur.  *Id.* at 13–14.  But defendants take few pains, if any at all, to explain why LTC Gong's understanding of these things supports the argument that defendants likely wouldn't issue another MPO. Instead, defendants just list these events.

They argue that LTC Gong "understood that the state court's termination of the [first] CPO was based on [an] agreement between plaintiff and Ms. Mader-Nauman." *Id.* at 14 (quotation cleaned up).  And the state court order dismissing this first CPO reflects such an agreement.  *Id.*  What's more, defendants suggest that LTC Gong understood that the first CPO was dismissed on the assumption that the MPO would remain in a modified form allowing plaintiff to communicate with Ms. Mader-Nauman about the care of the children.  *Id.*  And, they argue, LTC Gong received word that plaintiff "would not go near the children" with or without an MPO "until these matters were resolved," and plaintiff "agreed not to fight the continuation of the MPO otherwise." *Id.* (quotations cleaned up).  LTC Gong also asserted that in rescinding the MPO, he "gave COL Nauman some credit for the year-plus he operated under the MPO with minimal issues."  Doc. 25-1 at 3 (Second Gong Decl. ¶ 6).  Perhaps LTC Gong had these reasons in mind—as opposed to mooting the case—when he rescinded the MPO.  But those reasons don't explain *why* defendants rescinded the MPO so quickly after the court denied defendants'

first Motion to Dismiss. They merely justify the decision to do so. And they don't explain defendants' circular reasoning for rescinding the MPO.

On balance, the court isn't prepared to go as far as plaintiff would like. But still, the timing of these events and defendants' circular reasoning give the court pause. In other words, it's far from "*clear* that the defendant has not changed course simply to deprive the court of jurisdiction." *Jordan*, 654 F.3d at 1037 (emphasis in original) (internal quotation marks and citation omitted). Consequently, it isn't "absolutely clear" that the underlying controversy here is moot. *See Prison Legal News*, 944 F.3d at 881. And that's what the governing legal standard requires. *See id.*

## 2.    Conduct Not Reasonably Expected to Recur

*Second*, plaintiff argues defendants didn't self-correct sufficiently to eliminate reasonable expectation their conduct could recur. In a sense, the Army self-corrected. It rescinded the allegedly unconstitutional MPO. But according to plaintiff, defendants didn't alter the underlying procedure, declare that its previous act was unconstitutional, or promise that it wouldn't engage in similar conduct in the future. Doc. 24 at 12.

The Supreme Court's decision in *Fikre* is instructive. 601 U.S. 234. There, a United States citizen of Sudaneese birth was placed on a no-fly list. *Id.* at 237–38. He sued the FBI, alleging that the FBI had deprived him of due process by placing him on that list because of his race, national origin, and religion. *Id.* at 238–39. He sought a declaratory judgment and an injunction prohibiting the government from leaving him on the no-fly list. *Id.* at 239. After the litigation began, the FBI removed Mr. Fikre from the no-fly list. *Id.* Then, the FBI argued the case was moot. *Id.* The Court had other ideas. It held unanimously that defendants had failed— at the motion to dismiss stage, at least—to prove that the case was moot. *Id.* at 244–45.

Defendants face a heavy burden to show there is "no reasonable expectation" that "it will return to its old ways." *Id.* at 241 (quotation cleaned up). And the FBI failed to meet that burden because it merely submitted a "sparse declaration" promising it wouldn't place Mr. Fikre back on the no-fly list based on the information available at the time. *Id.* at 242. The Court also concluded that the FBI's arguments that Mr. Fikre was unlikely to face relisting weren't enough to move the needle. *Id.* at 243. And, ultimately, "[w]hat matters is not whether a defendant repudiates its past actions, but what repudiation can prove about its future conduct." *Id.* at 244.

So, what does the repudiation by defendants here—if one could call it that—prove about their future conduct? Defendants have not attested that they won't issue another MPO.[11] They haven't revised the policy or procedure for issuing MPOs. *See* Doc. 24 at 13. And, thus, plaintiff asserts, the Army still could prosecute the now-rescinded, allegedly unconstitutional MPO against plaintiff based on his past conduct. *Id.* at 7; Doc. 24-4 at 3–4 (Nauman Decl. ¶ 7)

---

[11]    Defendants did submit a declaration stating that elimination of the state court CPO "is unlikely to result in a new MPO." Doc. 25-1 at 3 (Second Gong Decl. ¶ 10). But, if "the facts substantially change, a new MPO may be needed." *Id.* While the case law doesn't require "some physical or logical impossibility" that the challenged conduct will recur, defendants haven't shown that their conduct isn't reasonably expected to recur. *See Brown*, 822 F.3d at 1167. Stating that rescinding the CPO is "unlikely" to cause defendants to issue a new MPO doesn't get them there. *See Fikre*, 601 U.S. at 242 ("[T]he government's representation that it will not relist Mr. Fikre based on 'currently available information' may mean that his past actions are not enough to warrant his relisting. But . . . none of that speaks to whether the government might relist him if he does the same or similar things in the future."). This is especially true when defendants could still enforce the MPO against plaintiff for past violations and there is some evidence that defendants' self-correction wasn't genuine. *See Brown*, 822 F.3d at 1167–68 ("And we have indicated that government self-correction provides a secure foundation for mootness so long as it seems genuine." (quotation cleaned up)).

Defendants also filed a supplement to their motion (Doc. 26). It provides that the District Court of Leavenworth County, Kansas entered a final order of protection against plaintiff after the briefing deadlines. Doc. 26 at 1 (noting the order of protection protects plaintiff's minor child, K.N.). But defendants don't tell the court how this final order affects the likelihood that the Army would issue another MPO. The final order is effective only until March 6, 2025. *See* Doc. 26-1 at 1; Kan. Stat. Ann. § 60-3107(e) (allowing for a number of extensions and making the order permanent only under certain circumstances). Simply identifying the final order from the state court proceeding does little to satisfy defendants' burden.

(during conversation on March 12, "LTC Gong reiterated the MPO was legal during its pendency, there was no fault with the MPO, and I could still be prosecuted for anything I did in violation of the MPO prior to March 12, 2024"). Defendants seem to agree. Doc. 25 at 2 n.4 (noting as part of their standing argument that "plaintiff has failed to demonstrate that his prosecution is real and immediate" but defendants "do not suggest that prosecution is inconceivable" (quotation cleaned up)).[12] It thus appears that defendants' allegedly unconstitutional conduct reasonably could recur. Defendants haven't shouldered their burden to prove otherwise.

The timeline on which defendants rescinded the MPO leaves some unexplained doubt about defendants' reasons and defendants' tepid explanations leave too much room for doubt about defendants' future intentions. In sum, defendants haven't shown their allegedly unconstitutional conduct reasonably isn't expected to recur. Defendants haven't shouldered their "formidable" burden to establish this case is moot under Article III. *See Fikre*, 601 U.S. at 241.

---

[12]     Defendants agree that future prosecution is possible—that much isn't in dispute. Doc. 25 at 2 n.4; Doc. 25-1 at 3–4 (Second Gong Decl ¶ 11) ("[T]he Office of Special Trial Counsel—not my office—will be responsible for reviewing the allegations in this case and deciding whether or not prosecution is warranted."). But it's unclear whether the prosecution LTC Gong discusses in his declaration involves violating state court orders or violating the now-rescinded MPO. *See* Doc. 25-1 at 3–4 (Second Gong Decl. ¶¶ 11–13); Doc. 25 at 3 (suggesting as part of standing argument that there's a difference). In any event, defendants don't refute plaintiff's statement that LTC Gong counseled plaintiff that he could be prosecuted for alleged violations of the MPO even after defendants rescinded it. And the MPO included a statement that violations could be prosecuted under Article 90 of the Uniform Code of Military Justice. Doc. 22 at 45 (November 2, 2022, MPO).

But defendants argue that the risk of future prosecution doesn't matter because "plaintiff's newly alleged injury is outside the operative Complaint." Doc. 25 at 5 (quotation cleaned up). And defendants assert, "plaintiff has failed to show that prosecution for violating the MPO is real or immediate." *Id.* (quotation cleaned up). But the court already has rejected any need to address standing. *See above* § III. Again, it's not plaintiff's burden to prove that prosecution is likely, real, or immediate. To the contrary, it's defendants' burden to prove that the allegedly unconstitutional conduct—issuing or enforcing the MPO or one like it—"could not reasonably be expected to recur." *Prison Legal News*, 944 F.3d at 881. And the court can consider facts not alleged in the Complaint on a factual attack on subject matter jurisdiction. *Holt*, 46 F.3d at 1003. So, the court can consider these facts when deciding whether defendants' conduct is reasonably expected to recur.

V.    **Prudential Mootness**

Defendants' last shot at dismissing this case comes in an appeal to the court's discretion, relying on the doctrine of prudential mootness. Doc. 23 at 9. "Prudential mootness addresses not the power to grant relief but the court's discretion in the exercise of that power." *S. Utah Wilderness All. v. Smith*, 110 F.3d 724, 727 (10th Cir. 1997) (internal quotation marks and citation omitted). In some cases, a controversy "is so attenuated that considerations of prudence and comity for coordinate branches of government counsel the court to stay its hand[.]" *Id.* (internal citations and quotation marks omitted). The court thus "may decline to grant declaratory or injunctive relief where it appears that a defendant, usually the government, has already changed or is in the process of changing its policies or where it appears that any repeat of the actions in question is otherwise highly unlikely." *Bldg. & Constr. Dep't v. Rockwell Int'l Corp.*, 7 F.3d 1487, 1492 (10th Cir. 1993); *Fletcher v. United States*, 116 F.3d 1315, 1321 (10th Cir. 1997) (same).

On this front, it's plaintiff who bears the burden to show why the court shouldn't dismiss on prudential mootness grounds. Where the party seeking prospective relief "can show that there exists some cognizable danger of recurrent violation, . . . [the court] will continue with the case even in the face of a simultaneous remedial commitment from another branch." *Winzler v. Toyota Motor Sales U.S.A., Inc.*, 681 F.3d 1208, 1211–12 (10th Cir. 2012) (quotation cleaned up); *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) ("The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive."). But unlike constitutional mootness, this burden is a modest one. *See Winzler*, 681 F.3d at 1212 ("[T]his 'cognizable danger' standard poses a relatively modest hurdle[.]"). And it doesn't require a plaintiff to prove the remedial

action will imminently or likely fail.  *Id.*  Plaintiffs instead must show the danger is "perceptible or recognizable from the evidence before the court."  *Id.*

Here, defendants argue that it's uncertain whether a ruling in this case would have a bearing on the parties' conduct.  Doc. 23 at 11.  What's more, they aver, the court shouldn't resolve this constitutional issue of first impression.[13]  *Id.*  So, defendants suggest that even if Article III allows the court to decide this case, it should exercise its discretion not to do so.  *Id.* at 10–11.  Plaintiff responds that his continuing status as an active-duty soldier subject to the orders of his commanding officers means the doctrine doesn't apply.  Doc. 24 at 13.  Here, plaintiff argues, the allegedly unconstitutional policy still exists, so there is a danger of a recurrent violation.  *Id.*  And, plaintiff asserts, there is no attenuation:  the circumstances haven't reduced or changed in a way that would remove the court's ability to provide meaningful relief.[14]  *Id.* at 13–14.  In reply, defendants limit their argument to just one sentence:  "Even if the [c]ourt finds some trace [of] standing to survive the constitutional mootness inquiry, the matter should be dismissed for prudential mootness."  Doc. 25 at 5.  The court evaluates, below, whether prudence encourages it to dismiss this case as moot.

Here, defendants haven't made a "remedial commitment" in the traditional sense.  *See Winzler*, 681 F.3d at 1211–12 (describing "when a coordinate branch steps in to resolve the problem" as a "remedial commitment").  Defendants haven't resolved the problem alleged—that is, they haven't "chang[ed] [their] policies[.]"  *Bldg. & Constr. Dep't*, 7 F.3d at 1492.  Instead,

---

[13]    Defendants frame the novel issue as "the very constitutionality of the military's response to domestic and child abuse within the ranks and/or the underlying acts of Congress."  Doc. 23 at 11.

[14]    Plaintiff also argued that he had a "substantial likelihood" of prevailing at trial on the CPO, so defendants would have every reason to reinstate an MPO to protect plaintiff's children.  Doc. 24 at 14.  But plaintiff didn't prevail at trial.  Instead, the District Court of Leavenworth County, Kansas entered a final order of protection against plaintiff.  Doc. 26 at 1; *see also* Doc. 26-1.

they merely rescinded the existing MPO. Doc. 24 at 13 (arguing there is a cognizable danger of recurrent violation because "the policy which [d]efendant employed . . . remains in place [and] [p]laintiff remains subject to that policy"); Doc. 22 at 8–9 (document canceling MPO). And as already addressed, there's still a risk that defendants could prosecute that MPO against plaintiff. *See above* § IV.B.2. What's more, defendants could issue another MPO.[15] *See* Doc. 24 at 14 (arguing that if the CPO is rescinded, defendants "would take it upon themselves to 'protect' the Nauman children"); Doc. 25-1 at 3 (Gong Decl. ¶ 10) ("Rescinding the [state court] CPO, in and of itself, is unlikely to result in a new MPO. If, however, the facts substantially change, a new MPO may be needed."). So, plaintiff adequately has identified the danger of a recurrent violation that is "perceptible or recognizable from the evidence before the court." *Winzler*, 681 F.3d at 1212. It isn't "highly unlikely" that defendants' actions will recur. *Bldg. & Constr. Dep't*, 7 F.3d at 1492.

At bottom, defendants haven't provided the relief plaintiff seeks. So, the "circumstances [haven't] changed since the beginning of litigation [to] forestall any occasion for meaningful relief." *S. Utah Wilderness All.*, 110 F.3d at 727. Recall that plaintiff seeks declaratory and injunctive relief on both procedural and substantive due process grounds. Doc. 1 at 5. If the court found plaintiff's due process rights were violated and granted his requested relief, defendants couldn't constitutionally prosecute plaintiff under the now-rescinded MPO. And defendants couldn't constitutionally issue similar MPOs against plaintiff under their existing

---

[15]    To the extent defendants argue the final order of protection against plaintiff forecloses this possibility, *see* Doc. 26, the court isn't convinced. Again, the final order expires on March 6, 2025. *See* Doc. 26-1 at 1; Kan. Stat. Ann. § 60-3107(e) (allowing for a number of extensions and making the order permanent only under certain circumstances). So, this situation tracks with plaintiff's argument that the Army could issue another MPO.

procedures.  So, there's still meaningful relief on the table.[16]  The court thus exercises its discretion and declines to dismiss the case on prudential mootness grounds.

## VI.    Conclusion

Both the Constitution and prudence allow federal courts to dismiss some cases as moot. This case isn't one of them.  Defendants haven't met their burden to prove their voluntary conduct mooted this case under Article III.  So, an Article III case or controversy still exists. And prudential considerations don't lead this court to conclude it nonetheless should dismiss the case.  There's a cognizable danger that defendants' allegedly unconstitutional conduct could recur.  Ultimately, meaningful relief is still available to plaintiff.  And, at this stage, the court refuses to deprive plaintiff of a judicial forum to seek that relief.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' Motion to Dismiss (Doc. 23) is denied.

**IT IS SO ORDERED.**

**Dated this 4th day of December, 2024, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**

---

[16]    Defendants also suggest that the court should stay its hand because this situation presents a novel constitutional question.  Doc. 23 at 11.  Per defendants, "[s]uch an important decision should be decided when the case can stand on its own legs."  *Id.*  Defendants cite a single out of circuit opinion in support. *Id.* at 10–11 (citing *Penthouse Int'l, Ltd. v. Meese*, 939 F.2d 1011, 1019–20 (D.C. Cir. 1991)).  In *Penthouse International*, the Circuit for the District of Columbia described part of the inquiry this way: "Where it is uncertain that declaratory relief will benefit the party alleging injury, the court will normally refrain from exercising its equitable powers.  This is especially true where the court can avoid the premature adjudication of constitutional issues."  939 F.2d at 1020 (internal citations omitted).  But the declaratory and injunctive relief plaintiff seeks here would provide meaningful relief.  And the Due Process Clause is a "constitutional provision with respect to which case law provides ample interpretive guidance*."  See Foretich v. United States*, 351 F.3d 1198, 1216 (D.C. Cir. 2003) (the "constitutional provision" at issue there was the bill of attainder clause).  So, the purportedly novel constitutional questions at issue here don't provide independent prudential bases to dismiss this case as moot.